IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| v. | : | **CRIMINAL NO. 14-118** |
| | : | |
| **JUSTIN MICHAEL CREDICO,** | : | |
|       **Defendant.** | : | |

**MEMORANDUM OPINION AND ORDER**

**Rufe, J.**                                                                                                   **November 10, 2016**

      Defendant Justin Michael Credico is charged with making threats to law enforcement officers and their families in violation of 18 U.S.C. §§ 115(a)(1)(A) and (B). On October 26, 2016, at Defendant's request, the Court reopened a hearing pursuant to *United States v. Starks*[1] to assess the accuracy and authenticity of recorded voicemail messages the Government proffers for use at trial. The initial *Starks* hearing occurred on July 2 and August 13, 2015 but was reopened so that the parties could address the recent revelation that the recordings at issue had been created using a cassette tape rather than a computerized system. Upon consideration of the evidence presented at the reopened *Starks* hearing, and for the reasons stated below, the Court holds that the government has satisfied its burden of proof under *Starks*.

**I.    FACTUAL AND PROCEDURAL HISTORY**

      On March 11, 2014, a grand jury in this District returned a four-count Indictment against Defendant: Count One, threats to a law enforcement officer (identified as FBI Special Agent #1) in violation of 18 U.S.C. § 115(a)(1)(B); Count Two, threats to the wife of FBI Special Agent #1 in violation of 18 U.S.C. § 115(a)(1)(A); Count Three, threats to a law enforcement officer

---

[1] 515 F.2d 112, 122 (3d Cir. 1975).

(identified as FBI Special Agent #2) in violation of 18 U.S.C. § 115(a)(1)(B); and Count Four, threats to the daughter of FBI Special Agent #2 in violation of 18 U.S.C. § 115(a)(1)(A). The Indictment alleges that Defendant engaged in a pattern of harassment of agents in the FBI's Philadelphia office culminating in messages left on or about February 4, 2014 in the voicemail box of FBI Special Agent #1 that contained threats against FBI Special Agent #1, FBI Special Agent #1's wife, FBI Special Agent #2, and FBI Special Agent #2's daughter.

At the initial *Starks* hearing in 2015, the government produced FBI Special Agent Joshua Hubiak, who stated that he produced the CD containing the voicemail recordings.[2] Agent Hubiak testified that all of the original voicemail messages had been forwarded from the voice mailbox of FBI Special Agent #1 (who was identified at the hearing as Special Agent Joseph Milligan) to a system known as ITACC. Agent Hubiak further testified that, using ITACC, he had copied these messages onto a CD, which the government intended to introduce into evidence and play for the jury at trial.[3]

The government also produced FBI Special Agent Joseph Carpenter, who interrogated Defendant following his arrest on February 12, 2014.[4] Agent Carpenter testified that Defendant stated on that day that he had recently called Agent Milligan to challenge him to a boxing match and to urge him to sign a waiver so that Defendant could kill him during the fight without being held legally responsible.[5] Agent Carpenter produced a handwritten statement that Defendant made during the interrogation, discussing the waiver and his animus against Agent Milligan. Some of the recordings mentioning the waiver were then played for Agent Carpenter, and Agent

---

[2] Hr'g Tr., August 13, 2015, at 30.

[3] *Id.* at 22:21-23:3.

[4] *Id.* at 84:15-23.

[5] *Id.* at 88:8-21.

Carpenter identified the voice in the recordings as Defendant's.[6] Additionally, the government presented Nigel Truman, a telecommunications engineer knowledgeable about the voicemail system, and Patrick Bowens, an FBI agent with extensive experience using the ITACC system.

Defendant, who was at the time representing himself *pro se*, then testified. On cross-examination, Defendant acknowledged that at least one of the recordings was accurate, and identified his own voice on multiple recordings. However, he claimed that some of recordings had actually been made in 2012—rather than in 2014 as the government alleged—and that some recordings had been altered, although precisely how the recordings had allegedly been altered was unclear.[7] At the end of the hearing, the Court ruled that Defendant could no longer represent himself because of his inappropriate behavior and appointed attorney Riley H. Ross, III, to represent him. Based on the testimony presented at the 2015 hearing, the Court concluded that the government had met its burden under *Starks* to show the authenticity and accuracy of the recordings.[8]

On October 8, 2016, Defendant filed a motion in limine to preclude introduction of the recordings or, in the alternative, to reopen the *Starks* hearing, based on the findings of a defense expert. The Court granted the motion to the extent it requested a reopening of the hearing.

At the reopened hearing on October 26, 2016, the government presented two witnesses. First, Special Agent Joseph Milligan testified that he heard the threats when he received them on his voicemail.[9] He stated that he and another agent recorded the threats from the voicemail system using a cassette tape recorder so that he could take the threats to the U.S. Attorney's

---

[6] *Id.* at 104:22-105:5.

[7] *See id.* at 122 (denying making certain calls in 2014 but stating "[t]hose other 2012 calls, yeah, definitely made those, most definitely"); 129-30 (admitting that he left message #4, though asserting that it was left in 2012 rather than 2014).

[8] *See* Doc. No. 131.

[9] H'rg Tr., Oct. 26, 2016, at 18:5-9.

Office.[10]  He further stated that his voicemail messages were not altered before the tape was created, the cassette tape was not altered after it was created,[11] and the content of the tape was the same as what he heard on his voicemail on February 4, 2014.  The last time Agent Milligan recalled having possession of the cassette tape was when he took it to the U.S. Attorney's Office.[12]  Agent Milligan could not recall whether he had forwarded the voicemails to Agent Hubiak, which had been his normal practice when he received threatening voicemails from Defendant.[13]

Next, Special Agent Joshua Hubiak retook the stand to clarify his previous testimony. Agent Hubiak testified that, at the 2015 hearing, he testified truthfully based on his knowledge at the time.[14]  However, he learned after an expert hired by Defendant inspected the CDs that the CD he had created from ITACC in fact only contained two of the eight voicemails in question,[15] and the CD that the government planned to use at trial instead was made from the cassette tape created by Agent Milligan and the other agent.[16]  Before testifying at the previous *Starks* hearing, Agent Hubiak had not compared the cassette tape and the ITACC CD, and therefore he testified under the assumption that the two CDs contained identical material.[17]  He stated that the cassette tape and a CD copy of the tape were stored in a manila case folder in a box in his and

---

[10] *Id.* at 21:2-23.

[11] *Id.* at 23:4-12.

[12] *Id.* at 37:8-11.

[13] *Id.* at 24:24-25:20.

[14] *Id.* at 40:21-23.

[15] According to Agent Hubiak, the CD contained five other voicemails which had been left on Agent Milligan's voicemail earlier, and had mistakenly been transferred to the CD. *Id.* at 16-23.

[16] *Id.* at 42:13-43:9.

[17] *Id.* at 68:7-17.

Agent Carpenter's cubicles at the Philadelphia FBI office.[18]  While no log was created to memorialize the chain of custody,[19] Agent Hubiak stated that, to his knowledge, the tape was not tampered with while it was stored at the FBI office.[20]

Defendant then presented Paul Ginsburg, an electrical engineer specializing in forensic audio, whom the Court deemed qualified to testify as an expert witness.[21]  Mr. Ginsburg testified that he attempted unsuccessfully to compare the government's trial CD containing the voicemails with the original voicemails.  When Mr. Ginsburg asked to listen to the original voicemails, Agent Hubiak informed him that they were not available on ITACC because, once copied to a CD, the original files could no longer be accessed on ITACC.  Mr. Ginsburg testified that he was surprised that the ITACC files were not accessible and that the cassette tape and CD copy of it were not in an official evidence bag.[22]  According to Mr. Ginsburg, a number of factors could affect the quality of the recordings based on their storage, including humidity and temperature of the storage environment.[23]  Mr. Ginsburg also expressed concern about background noise on the cassette tape recording that he could not identify,[24] and stated that it would be possible to compile voicemails from different time periods and "cover up the edits."[25]  Ultimately, Mr. Ginsburg opined that the creation and handling of the recordings in this case was "disappointing" and "limiting" because he was unable to analyze original recordings.[26]

---

[18] *Id.* at 43:10-21; 45:6-13.

[19] *Id.* at 58:3-13.

[20] *Id.* at 44:17-20.

[21] *Id.* at 88:6-11.

[22] *Id.* at 96:25-97:9; 98:12-19.

[23] *Id.* at 101:24-102:6.

[24] *Id.* at 107:6-14.

[25] *Id.* at 116:18-117:6.

[26] *Id.* at 114:4-23.

**II. DISCUSSION**

In *United States v. Starks*, the Third Circuit held that "[w]hen a colorable attack is made as to a tape's authenticity and accuracy, the burden on those issues shifts to the party offering the tape, and the better rule requires that party to prove its chain of custody."[27]  In order to prove accuracy and authenticity, the government must show:

(1) That the recording device was capable of taking the conversation now offered in evidence.
(2) That the operator of the device was competent to operate the device.
(3) That the recording is authentic and correct.
(4) That changes, additions, and deletions have not been made in the recording.
(5) That the recording has been preserved in a manner that is shown to the court.
(6) That the speakers are identified.
(7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.[28]

The government must prove accuracy and authenticity by "clear and convincing evidence."[29]

Upon consideration of the evidence presented at the reopened hearing, as well as evidence presented at the 2015 *Starks* hearing, the Court determines that, despite certain irregularities that should have been identified at the initial hearing, the government has met its burden of proof under *Starks*.  The testimony of Agent Milligan established that the cassette tape recorder was capable of recording the voicemails at issue, and that he and Agent Lewis were capable of operating the device.   The testimony of Agents Milligan and Hubiak showed that the recordings are accurate and were not altered by the government.  Agent Hubiak described the manner in which the recordings have been preserved.  Agent Carpenter's testimony, combined with Defendant's own admissions, established that the voice on the recordings belongs to Defendant.  There is no evidence to suggest that Defendant's decision to call Agent Milligan and

---

[27] *Starks*, 515 F.2d at 122.

[28] *Id.* at 121 n. 11 (quoting *United States v. McKeever*, 169 F. Supp. 426, 430 (S.D.N.Y. 1958)).

[29] *Id.* at 121.

leave messages on his voicemail was anything other than voluntary. The Court credits the testimony of Agents Milligan and Hubiak, and finds that the mere possibility that the recordings were altered, absent any evidence of alteration, is not enough to render the recordings inadmissible under *Starks*. The government's management of this case leaves something to be desired; however, its mistakes are not at this juncture fatal to its case.[30] The Court does not determine when the voicemails in question were left, as this is a question for the jury.

## III. CONCLUSION

For the reasons stated above, the government has proven the accuracy and authenticity of the recorded voicemail messages it now proffers for use at trial for the purposes of *Starks*. An appropriate Order follows.

---

[30] *See United States v. Bankoff*, No. CR.A. 07-185, 2008 WL 638236, at *3 (E.D. Pa. Mar. 7, 2008) (quoting *United States v. Whitted*, No. 05-598-08, 2006 WL 3327671 (E.D. Pa. 2006)) ("The district court has considerable discretion in determining how to make the ruling on authentication and also in adjudicating the competing concerns and assuring that all the evidence submitted to the jury is authentic.").